**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ST. JOSEPH'S HOSPITAL,                  :
                                        :
         Plaintiff,                     :
                                        :
    v.                                  :  Civil Action No. 04-2147 (JR)
                                        :
MICHAEL LEAVITT, Secretary,             :
Department of Health and Human          :
Services,                               :
                                        :
         Defendant.                     :

<u>MEMORANDUM</u>

        Plaintiff St. Joseph's Hospital sues the Secretary of
Health and Human Services (HHS) seeking APA review of his
decision to deny its claim for a Medicare disproportionate share
payment adjustment.  Plaintiff and defendant have cross-moved for
summary judgment.  Because it was arbitrary or capricious to
overrule the unanimous decision of an agency appellate board on
the ground that St. Joseph's had failed to include particular
words in its appeal, the government's motion [Dkt. #12] will be
**denied**; and the hospital's motion [Dkt. #10] will be **granted.**


1.   <u>Background</u>

     a.   <u>The Medicare fraction and general assistance days</u>

          St. Joseph's is a 314-bed, not-for-profit, certified
Medicare-participating provider in St. Paul, Minnesota.  Dkt.
#10-3 at 1; Dkt. #12-2 at 1.  The government pays for covered
services rendered to Medicare-eligible patients, pursuant to the

Medicare statute and regulations.  Dkt. #12-1 at 3.  The program
is administered by the Centers for Medicare & Medicaid Services
(CMS), Dkt. #10-2 at 3, which in turn contracts with "fiscal
intermediaries" (FIs) to administer its payment functions.  42
U.S.C. § 1395h.

A participating hospital submits a cost report to its
fiscal intermediary at the close of each fiscal year.  42 C.F.R.
§§ 413.20(b), 413.24(f).  The fiscal intermediary audits the cost
report and issues a Notice of Program Reimbursement (NPR), which
identifies and briefly explains any adjustments to the hospital's
cost report.  Dkt. #10-2 at 4.

Hospitals may receive additional Medicare payments
based on hospital-specific factors.  Id.  One adjustment, the
"disproportionate share hospital" (DSH) adjustment, is for
hospitals that serve a "significantly disproportionate number of
lower income patients."  42 U.S.C. § 1395ww(d)(5)(F)(i)(I).  A
hospital qualifies for the DSH adjustment for a given cost-
reporting period if its "disproportionate patient percentage" for
that period equals or exceeds thresholds specified by statute.
42 U.S.C. § 1395(d)(5)(F)(v).[1]  That percentage is a combination
of two other measures: the Medicare and Medicaid fractions.  42

---

[1]     Under promulgated regulations, the hospital seeking a
DSH adjustment has "the burden of furnishing data adequate to
prove eligibility" and "of verifying with the State the patient
as eligible for Medicaid during each claimed patient day."  42
CFR § 412.106(b)(4)(iii).

U.S.C. § 1395ww(d)(5)(F)(vi).  Only the Medicaid fraction is at issue here.  It is the "number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under [Title XIX of the Social Security Act ], but who were not entitled to benefits under [Medicare Part A, divided by] the total number of the hospital's patient days for such period."  42 U.S.C. § 1395ww(d)(5)(F)(vi).

　　　　After several of years of litigation over the Secretary's interpretation that Medicaid patient days could not be included in the numerator if services were paid for by Medicare, CMS issued a ruling in 1997, stating that, "on a prospective basis, [CMS] will count in the Medicaid fraction the number of days of inpatient hospital services eligible for Medicaid on that day, whether or not the hospital received payment for those inpatient hospital services."  Ruling 97-2; Dkt. #8 at 347-48; quoted at Dkt. #10-2 at 9.  In the year after Ruling 97-2 was released, however, there was continuing confusion about which state-run program days qualified as "Medicaid eligible" days.  Dkt. #10-2 at 9.  Some states, such as Minnesota, ran assistance programs for low-income individuals and were unable to give legally definitive answers about whether such general assistance programs were part of their approved Medicaid plans.  Dkt. #10-2 at 9-10.  Some fiscal intermediaries allowed

hospitals to count patient days that were covered by state general assistance programs for low-income individuals -- "general assistance days" -- and some (those in New York and Pennsylvania, especially) did not, demanding that hospitals refund prior DSH payments that were calculated including such general assistance days.  Dkt. #10-2 at 10.

On October 15, 1999, the Deputy Administrator of CMS announced that the agency had decided to "hold hospitals harmless" for DSH payments that had been calculated including general assistance program days, for cost periods beginning prior to January 1, 2000.  Dkt. #10-2 at 10.  In the announcement, which took the form of a letter to the Chairman of the Senate Finance Committee, CMS stated that "guidance on the calculation of Medicare DSH, particularly with regard to the inclusion of general assistance days, was neither sufficiently clear nor well understood...  Many hospitals, fiscal intermediaries and state Medicaid agencies have differing understandings about the particulars of the DSH calculation."  Dkt. #10-2 at 11.

The October 15 letter was followed, in December 1999, by the formal issuance of CMS Program Memorandum A-99-62 (the "Hold Harmless Rule").  The Hold Harmless Rule had two main provisions.  First, hospitals that had received DSH payments based on the inclusion of general assistance days in cost reports settled before October 15, 1999, could keep the funds and

continue to be reimbursed for the same types of program days for fiscal years beginning before January 1, 2000.  Second, hospitals that did not receive payment calculated with general assistance days, but appealed the issue prior to October 15, 1999, could receive DSH reimbursement reflecting the inclusion of otherwise "ineligible" general assistance program days for fiscal years beginning prior to January 1, 2000.  Dkt. #8 at 676; Dkt. #10-2 at 11.  It is the second provision that is (finally) at the center of this case.  It provided (taking the form of a direction to the fiscal intermediaries):

> If, for cost reporting periods beginning before January 1, 2000, a hospital that did not receive payments reflecting the erroneous inclusion of otherwise ineligible days filed a **jurisdictionally proper appeal ... on the issue of the exclusion of these types of days from the Medicare DSH formula before October 15, 1999**, reopen the cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days.

Dkt. #8 at 676; Dkt. #10-2 at 11 (emphasis added).  "Otherwise ineligible days" included "general assistance or other State-only health program, charity care, Medicaid DSH, and/or other ineligible waiver or demonstration population days for cost reports that were settled before October 15, 1999."  Dkt. #8 at 435.

    b.   St. Joseph's claim

        At the time when St. Joseph's filed its fiscal year 1995 cost report, the State of Minnesota was administering

- 5 -

several programs for its low-income residents, including a "general assistance" program.  When the Minnesota Medicaid agency was unable readily to provide information concerning which of the programs were part of the state Medicaid plan under Title XIX, however, Dkt. #8 at 126-127; Dkt. #10-2 at 12, the Minnesota fiscal intermediary decided not to allow Minnesota hospitals to count patient days associated with general assistance programs. Dkt. #10-2 at 13.

St. Joseph's 1995 report counted as "Medicaid days" only those days that it had coded as days paid by Medicaid.  Dkt. #12-1 at 10.  When the Minnesota fiscal intermediary reviewed St. Joseph's 1995 DSH calculation, however, it found that 5 of the 25 patients whose records were sampled were not Medicaid, but general assistance, Medicare, or alternative care patients.  The intermediary rejected the cost report and asked the hospital to regenerate the report to correct the errors.  Dkt. #10-2 at 13. St. Joseph's submitted a second report, but it did not contain service dates and other information needed to test its validity. Dkt. #12-1 at 11.  When the intermediary found similar errors in a third St. Joseph's report, it disallowed the DSH adjustment in its entirety:

> Based on the sample ... this report includes general
> assistance patients.  Based on the number of other errors
> found, no further review of Consolidated Chemical Dependency
> of UCARE MN will be done at this time.  Due to the errors
> found (22%) error rate, DSH will be disallowed.

Dkt. #8 at 356; Dkt. #10-2 at 14.   <u>See also</u> Dkt. #8 at 357 ("Adjustment #49: Disproportionate Share").

The Notice of Program Reimbursement (NPR) issued to St. Joseph's for fiscal year 1995 included an audit adjustment report with a brief reason for each adjustment.  For the DSH disallowance, the intermediary's audit adjustment report states: "To disallow DSH since the provider is including Non-Medicaid days in their DSH calculation.... 16-8B-1."  Dkt. #8 at 772; Dkt. #10-2 at 14.  The "16-8B-1" refers to the audit work-papers that support the adjustment.  The work papers indicate that the rejected sample contained five general assistance patients and one Blue Cross/Blue Shield of Minnesota patient.  Dkt. #8 at 355.

On March 18, 1998, St. Joseph's filed a timely initial notice of appeal of the NPR to the Provider Reimbursement Review Board (PRRB).  In accordance with the PRRB instructions then in effect, St. Joseph's identified the DSH adjustment as one of the issues under appeal.  Dkt. #10-2 at 14.  The notice stated: "Adj. No. 46 – Disproportionate Share Adjustment[.]  We believe the DSH reimbursement is significantly understated.  The intermediary did not properly recognize all appropriate DSH related days of service.  Effect is $10000."  Dkt. #8 at 761.

When CMS issued its Hold Harmless rule, in December 1999, St. Joseph's was in the early stages of its PRRB appeal.  Dkt. #10-2 at 15.  In April 2000, St. Joseph's invoked the Hold

- 7 -

Harmless Rule, asserting that had filed "a jurisdictionally
proper appeal [to the PRRB] ... on the issue of the exclusion of
Medicaid eligible days prior to October 15, 1999." Dkt. #8 at
429. The CMS response (over a year later -- this process is
deliberate) was that St. Joseph's was not eligible for Hold
Harmless relief because the intermediary had disallowed the
entire DSH payment -- not only the portion based on general
assistance days -- and had done so because of inadequate
documentation. Dkt. #10-2 at 16. "[T]he wording in the
[hospital's] appeals ... does not specifically mention the type
of days described in PM A-99-62.... The type of non-Medicaid days
were not mentioned in the adjustment." Dkt. #8 at 435. Neither
the disallowance nor the appeal, in other words, had employed the
magic words "general assistance days."

        St. Joseph's appealed to the PRRB, which (after another
two years) unanimously ruled in the hospital's favor, holding
that

        the Provider is covered under Program Memo A-99-62 because
        it claimed [general assistance days] in its initial and
        subsequent submissions to the Intermediary.  This issue was
        specifically mentioned in the Intermediary's audit
        adjustment denying reimbursement, and the Provider properly
        appealed that specific audit adjustment.  **The need for any
        specific language in the appeal was unknown at the time the
        Provider filed its appeal and should not be used to deny its
        otherwise valid appeal of [general assistance days].**  It is
        undisputed that the Provider did include [general assistance
        days] in the days it submitted to the Intermediary in its
        DSH calculations.  The Intermediary denied all of the
        Provider's DSH data, and therefore, denied the [general
        assistance days] that the Provider claimed....  The language

- 8 -

in the [Intermediary's] workpapers clearly indicates that it
was the Provider's inclusion of non-Medicaid days, and,
specifically, "General Assistance" days, in the data that
caused the Intermediary to deny the entire DSH payment.

Dkt. # 8 at 44; Dkt. #10-2 at 16 (emphasis added).

The CMS administrator reversed the PRRB's decision:
"While the Provider filed an appeal before October 15, 1999, the
appeal did not raise the precise issue of the exclusion of
[general assistance] days."  Dkt. #8 at 16.  The Administrator's
decision is the final decision of the Secretary in this matter,
and St. Joseph's has timely sought judicial review.


2.   **Analysis**

     a.   Standard of Review

          I am to review the Administrator's decision using the
standard set out in the Medicare Act, 42 U.S.C. § 1395oo(f)(1),
which expressly incorporates the APA's "arbitrary, capricious,
... abuse of discretion" or "unsupported by substantial evidence"
standards of review.  5 U.S.C. § 706(2)(A) & (E); see St.
Elizabeth's Med. Ctr. v. Thompson, 396 F.3d 1228, 1233 (D.C. Cir.
2005).

          "The scope of review under the "arbitrary and
capricious" standard is narrow and a court is not to substitute
its judgment for that of the agency."  Motor Vehicle Mfrs. Assoc.
v. Farm Mut. Ins. Co., 463 U.S. 29, 43 (1983).  Similarly, the
substantial evidence standard of review is "highly deferential."

- 9 -

<u>National Meds. Enterps., Inc. v. Shalala</u>, 43 F.3d 691, 693-4 (D.C. Cir. 1995).  Substantial evidence is "such relevant evidence as a reasonable mind accept as adequate to support a conclusion" taking into account "whatever in the record fairly detracts from its weight."  <u>AT&T Corp. v. FCC</u>, 86 F.3d 242, 247 (D.C. Cir. 1996).

  b. <u>Application of the Standards</u>

   The premise of the Secretary's decision is that St. Joseph's appeal, although "jurisdictionally proper," was not precisely "on the issue of the exclusion of these types of days." The Secretary notes that the Program Memorandum also specifically stated that a provider would not qualify for relief under PM A-99-62 if "the issue of exclusion of these types of days" was added to an appeal already pending before the PRRB "on other Medicare DSH issues or other unrelated issues."  Dkt. #12-1 at 352.  This, according to the Secretary, is enough to support a requirement that a DSH-based appeal "clearly articulate" that the appeal included a specific appeal on the inclusion of general assistance days, Dkt. #12-1 at 21, which the St. Joseph's appeal did not.

   In <u>United Hospital</u>, 383 F.3d 728 (8th Cir. 2004), a hospital filed a jurisdictionally appropriate appeal with the PRRB without reference to any DSH day-counting and later sought to take advantage of PM A-99-62 by amending its appeal after

October 15, 1999, as was otherwise allowed by HHS regulations, to include the issue.  The Eighth Circuit ruled against the hospital, id. at 730.

> The basic structure of the Program Memo[randum] distinguished between hospitals that [had wrongly] believed themselves eligible for state-only days, and hospitals that [had] correctly realized that they were not eligible [but] then pursued benefits once it became clear that mistaken hospitals would not have to pay for their error.

The Secretary adopts that reasoning, emphasizing the limited nature of the relief the memorandum was meant to provide, and objecting to a rule that would allow relief to providers who "never operated under the misapprehension."  Dkt. #12-1 at 23.

        The policy content of the Secretary's position -- that a windfall form of forgiveness will be given to those who guessed wrong, while those who guessed right will get nothing -- seems very strange.  A court is not to substitute its policy views for those of an Executive branch agency, however.  The question I have to answer is whether the Secretary's decision -- that the unanimous decision of the PRRB must be reversed because St. Joseph's failed to use the magic words "general assistance days" in its appeal -- was arbitrary, or capricious, or unsupported by substantial evidence in the record, or contrary to law.

        At the time that St. Joseph's filed its appeal, the PRRB required only that an initial notice of appeal be filed "in writing" and that it include an identification of the issues in dispute, a short explanation of the basis for the dispute, the

final audit report, the audit adjustment numbers, a copy of the
final determination, and the audit adjustment pages relating to
the issue in dispute.  Dkt. #8 at 297; Dkt. #10-2 at 22.
Plaintiff's appeal said, in relevant part: "Adj. No. 46 –
Disproportionate Share Adjustment[.]  We believe the DSH
reimbursement is significantly understated.  The intermediary did
not properly recognize all appropriate DSH related days of
service.  Effect is $10000."  Dkt. #8 at 761.  Plaintiff included
with its appeal the final audit report, which stated, for audit
adjustment 46, "Disallow DSH since the provider is including non-
Medicaid days in their DSH calculation."  (42 CFR 42.102, Subpart
G) 16-8B-1."  Dkt. #8 at 772.  The string 16-8B-1 referred to
audit workpapers for the specific adjustment, which workpapers
contained the more detailed analysis of the intermediary's basis
for the adjustment.  Those workpapers (1) state that "[b]ased on
the sample above, this report includes general assistance
patients....  Due to the number of errors found (22% error rate)
DSH will be disallowed," and (2) demonstrate that the audit
specifically listed and labeled patient-day claims "paid by
General Assistance ... program does not contain Federal funds."
Dkt. #8 at 356.  The Secretary hints that the plaintiff should
not be allowed to rely on the language in the intermediary audit
worksheets, which, he concedes, were attached to the hospital's
appeal.  Dkt. #12-1 at 18.  The Secretary suggests that it is not

permissible, under the Hold Harmless Rule, "to go beyond the notice of appeal itself."  This argument is, I think, untenable. It is akin to asking an appellate court to look only at a motion a party filed below, without considering the exhibits that were attached to the motion.  It is a nonsensical interpretation of the memorandum, especially given that PRRB instructions specifically made attachments part of a party's notice of appeal. Dkt. #8 at 297.

While the PRRB's own instructions only required a short statement of the issue on appeal, it is clear, tracking the document trail, that the exclusion of general assistance days provided <u>at least</u> one reason for the appeal of the DSH disallowance, and perhaps the main reason.  The Secretary argues that this case is, in essence, just like the <u>United Hospital</u>. Dkt. #12-1 a 21.  However, the two cases differ in crucial respects.  In the <u>United Hospital</u> case, the plaintiff sought to use an existing regulation to do something the memorandum explicitly said it could not do -- raise a DSH appeal that it had failed to raise prior to October 15, 1999.  In this case, the plaintiff is using the PRRB's directions to explain why it would be unreasonable to expect that a jurisdictionally proper DSH appeal raised prior to October 15, 1999 would include highly specific or detailed descriptions of the exact nature of the

appeal -- and thus unreasonable to expect it to include the magic words "general assistance days."

The Secretary posits, by way of post-hoc rationalization, that St. Joseph's was not confused about the inclusion/exclusion of general assistance days and simply did poor record-keeping.  Dkt. #12-1 at 19.  That suggestion was not part of the administrator's decision below and need not be taken into account in my review.  See Biloxi Regional Medical Center v. Bowen, 835 F.2d 345, 348 n.12 (D.C. Cir,. 1987)(citing SEC v. Chenery Corp., 318 U.S. 80 (1943)).

*     *     *     *     *

I find that the Secretary's decision to deny St. Joseph's claim was arbitrary or capricious.  St. Joseph's motion for summary judgment [Dkt. #10] will be **granted**; the Secretary's motion for summary judgment [Dkt. #12] will be **denied.**  An appropriate order accompanies this memorandum.


                              JAMES ROBERTSON
                         United States District Judge